**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| RICHARD EVANS, derivatively on behalf of UNITED DEVELOPMENT FUNDING IV, | |
| Plaintiff, | Case No.:    3:16-cv-00635 |
| -against- | **VERIFIED SHAREHOLDER DERIVATIVE** |
| HOLLIS M. GREENLAW, PHILIP K. MARSHALL, J. HEATH MALONE, STEVEN J. FINKLE, JOHN R. RAY, TODD ETTER, UMTH GENERAL SERVICES, L.P., and UMTH LAND DEVELOPMENT, L.P., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| UNITED DEVELOPMENT FUNDING IV, | |
| Nominal Defendant. | |

## ORIGINAL COMPLAINT

Plaintiff Richard Evans ("Plaintiff"), by and through the undersigned counsel, brings this action derivatively on behalf of nominal defendant United Development Funding IV ("UDF" or the "Company"), due to the acts of UDF, and makes the following allegations against certain of the members of UDF's board of trustees (the "Board"), and certain senior level executives and officers of the Company.  The allegations of this Complaint are based on the personal knowledge of Plaintiff as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through her attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings, news reports, press releases, various court documents, and other publicly available documents and

information concerning UDF and the matters contained herein.  Based on the allegations in this Complaint, Plaintiff asserts derivative claims for breach of fiduciary duty and unjust enrichment against certain of the members of UDF's Board.

## NATURE AND SUMMARY OF ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf and for the benefit of UDF.  Plaintiff alleges claims of breach of fiduciary duty, unjust enrichment, and corporate waste against UDF's Board.  As alleged herein, the Board must be held accountable for its wrongdoing and mismanagement, which have already exposed the Company to crippling risks and damages in the form of civil lawsuits and governmental enforcement actions.

2.      UDF is a real estate investment trust ("REIT") that issues loans to acquire and develop residential communities.  While many REIT's prove to be superb investments, UDF has recently been revealed as a massive "Ponzi" scheme.  UDF loans and receives money to/from other related entities, *e.g.*, United Development Fund I, United Development Fund III, United Development Fund V (the "Related Entities").  With money received from these other entities, UDF repays money it borrowed in previous years.  The loans themselves do not generate any cash income for the Company, however.

3.      UDF's scheme began with RCS Capital, a broker-dealer founded and formerly chaired by Nicholas Schorsch ("Schorsch"). RCS Capital sold securities in UDF and the Related Entities to retail investors. This money is then passed between UDF and the Related Entities and lent to developers, especially to Centurion American, a development company owned by Mehrdad Moayedi ("Moayedi"), and Thomas Buffington. With the money raised and filtered through UDF and the Related Entities, UDF pays dividends that exceed the cash generated by UDF's operations.

2

4.      A review of the Company's lending practices supports the conclusion that the Board has been operating a "Ponzi" scheme.  UDF's loan portfolio is dangerously concentrated with just a handful of borrowers—88% of UDF's loans are either to Centurion American, Thomas Buffington, or other UDF-related entities.  Centurion American and Mr. Buffington do not appear able to repay the loans in a timely manner, according to public filings.  Furthermore, a number of UDF's loans to Centurion American contain unusually high debt service requirements (approx. 13% annual interest on average) and have not resulted in any cash receipts to UDF.

5.      It also appears that a number of UDF's loans are secured by unimproved property. This fact expressly contradicts public statements made by UDF's management in filings with the SEC.  Several supposed development sites in fact contain no development whatsoever.  Indeed, representatives of Hayman Capital Management LP ("Hayman") traveled to supposed development sites, only to find that no development was taking place. For example, the Alpha Ranch Development site outside of Fort Worth, Texas is completely desolate, producing no income for its "developer," Centurion American.

6.      Additionally, the Board has allowed UDF's executives to enter into a number of self-interested transactions.  These transactions consist, in part, of deficient loans that have been accruing interest at below-market rates.  These loans have been deficient for several years and currently amount to approximately $73 million.  The Board has allowed UDF to avoid recognizing these loans as losses, but rather assets in the form of "deficiency notes" and "recourse obligations."

7.      The exposure of UDF as a "Ponzi" scheme, and the mismanagement by the Board, has resulted in significant damage to the Company. First, these revelations caused UDF's stock to drop $6.05 per share on December 10, 2015, a 35% drop. On that day, UDF finally acknowledged that it had been under SEC investigation since April 2014. The disclosure of the SEC investigation

caused the Company's stock to fall another $2.60 per share, or 23%, to close at $8.55 per share on December 11, 2015. Then, on February 18, 2016, the Federal Bureau of Investigation raided UDF's offices. The FBI raid resulted in the Nasdaq stock market ("NASDAQ") halting trading of UDF stock. As of the date of this filing, the trading halt status on UDF stock has not been lifted.

8.      This litigation on behalf of UDF seeks to rectify the conduct of the individuals bearing ultimate responsibility for the Company's conduct—the Company's current and former trustees and senior management—and to impose appropriate responsibility upon those individuals.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff seeks more than $75,000 in damages and Plaintiff is a citizen of Nevada and no other party is a citizen of Nevada.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

11.      This is not a collusive action to confer jurisdiction on the Court which it would not otherwise have.

12.      This Court has personal jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

## THE PARTIES

13.      The Plaintiff is a current shareholder of UDF and has held the Company's stock continuously from December 29, 2014 to the present.  The Plaintiff is a resident of Nevada.

14.     Nominal defendant UDF is a Maryland corporation with its principal place of business located at 1301 Municipal Way, Suite 100, Grapevine, Texas 76051. UDF is traded on the NASDAQ under the symbol UDF.

15.     Hollis M. Greenlaw ("Greenlaw") has served as the Board's Chairman and the Company's CEO since UDF's formation in 2008. Greenlaw has also served in executive and board capacities of several related entities: (a) partner, Vice Chairman, and CEO of UMT Holdings, L.P. ("UMTH"); (b) President, CEO, and a director of UMT Services, Inc. ("UMT Services"); (c) co-founder of United Development Funding, L.P. ("UDF I"), United Development Funding II, L.P. ("UDF II"), United Development Funding III, L.P. ("UDF III"), and United Development Funding Land Opportunity Fund, L.P. ("UDF LOF"); (d) CEO and Chairman  of United Development Funding Income Fund V ("UDF V"); (e) partner of UDF Holdings, L.P. ("UDFH"), one of the sponsors of UDF V; (f) President and CEO of UDF Services, LLC ("UDF Services"), the general partner of UDFH; (g) CEO of UMTH Land Development, L.P. ("UMTH LD"), the Company's asset manager. Greenlaw is a resident of Texas.

16.     Philip K. Marshall ("Marshall") has served as a member of the Board since 2008. Marshall is the chairman of the Board's audit committee. While working for the accounting firm Whitley Penn LLP, Marshall served as the audit partner for United Mortgage Trust ("UMT"). Marshall is a resident of Texas.

17.     J. Heath Malone ("Malone") has served as a member of the Board since 2008. Malone is the chairman of the Board's nominating and governance committee. Malone is a resident of Texas.

18.     Steven J. Finkle ("Finkle") has served as a member of the Board since 2008. Finkle is the chairman of the Board's compensation committee. Finkle is a resident of Maryland.

19.     John R. Ray ("Ray") has served as a member of the Board since 2013. Ray is a resident of Texas.

20.     Defendants Greenlaw, Marshall, Malone, Finkle, and Ray served on the Board during the time that at least some of the misconduct alleged herein occurred and are collectively referred to as the "Director Defendants."

21.     Todd Etter ("Etter") is (a) the Chairman and a partner of UMTH, (b) a half owner and director of UMT Services (the general partner of UMTH and UMTH LD), and (c) a principal or affiliate of several other entities that are related to UDF and the Related Entities.

22.     UMTH General Services, L.P. ("UMTH GS") is the Company's supposedly external manager or advisor and the general partner of UMTH LD.

23.     UMTH Land Development, L.P. ("UMTH LD") is the Company's asset manager, as well as the general partner of UDF III and asset manager of UDF LOF.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Company Background*

24.     UDF was organized on May 28, 2008 as a Maryland REIT. UDF controls various limited partnerships through which the Company operates its business. According to its most recent Annual Report on Form 10-K filed with the SEC on March 16, 2015 (the "2014 10-K"), UDF primarily originates, purchases, participates in, and holds for investment secured loans used for the acquisition and development of real property as single-family residential lots or mixed-use master planned residential communities, for the construction of single-family homes, and for completed model homes. In addition, the Company purports to make direct investments in land for development into single-family lots, home construction, and portfolios of finished lots and model

homes and provides credit enhancements to real estate developers, home builders, land bankers, and other real-estate investments.

25.     Beginning in 2010, the Company made an election to be taxed as a REIT. REIT status allows the Company to avoid generally paying federal income tax on income that is distributed to UDF shareholders.

26.     UDF is one of several affiliated funds. The other members of the United Development Funding family are UMT, UDF III, and UDF V, (collectively, the "Related Funds"). The Related Funds are public non-traded REITs, whereas UDF is publicly traded on the NASDAQ. As public non-traded REITs, the Related Funds are required to file reports with the SEC, but unlike UDF, are not traded on an exchange.

27.     Like UDF, the Related Funds primarily originate and invest in loans for the acquisition and development of single-family residential lots. In that vein, UDF's and the Related Funds' businesses overlap to a large extent. For example, transactions with UDF's largest borrower, Centurion American constitute 43% of UDF III's, 67% of UDF's, and 62% of UDF V's businesses, respectively.

28.     In addition, UDF's and the Related Funds' management overlaps to a great extent. Greenlaw is the co-founder of UDF III and has served as CEO and chairman of the board of trustees of UDF V since June 2012. Likewise, Marshall, purportedly an independent trustee, is also a trustee of UMT.

29.     UDF illustrated its organizational structure with the following diagram in its filings with the SEC:



30.     On April 22, 2014, the Company adopted its Code of Business Conduct and Ethics (the "Ethics Code").[1] The Ethics Code acknowledges that a commitment to "the highest standards of business conduct . . . requires that [UDF] conduct [its] business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics." "All trustees, officers and employees of the Trust are expected to understand, respect and comply with this Code and all of the laws, regulations, policies and procedures that apply to them in their positions with the Trust."

31.     The Ethics Code addresses conflicts of interest that may arise on the part of Board members, officers, and employees. Specifically, the Ethics Code states that the Company's Board

---

[1] Available at: http://www.udfonline.com/code-of-conduct/ (accessed on March 1, 2016).

members, officers, and employees "should avoid any action or interest that conflicts with, or gives the appearance of a conflict with, the Trust's interests." According to the Ethics Code, "[a] 'conflict of interest' exists whenever an individual's private interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Trust." The Ethics Code further states that a conflict of interest will result if a Board member or officer "receives improper personal benefits as a result of his or her position with the Trust, whether from a third party or from the Trust." Regarding the reporting of a conflict of interest, the Ethics Code recommends that "[a]ny employee, officer or trustee that becomes aware of a conflict or potential conflict should bring it to the attention of higher levels of management, the board of trustees, the Chief Executive Officer, the Chief Operating Officer or the General Counsel."

32.     Greenlaw is both the Chairman of the Board and the CEO of the Company. According to UDF's most recent Schedule 14A Proxy Statement filed with the SEC on April 30, 2015 (the "2015 Proxy"), the purportedly independent trustees of the Board believe that maintaining Greenlaw as both the Chairman and CEO is appropriate because the CEO "is ultimately responsible for [the Company's] day-to-day operations and for executing [its] business strategy, and because [UDF's] performance is an integral part of the deliberations of [the Board.] . . . In addition, although [UDF does] not have a lead independent trustee, [the Board] believes that the current structure is appropriate, as [UDF is] externally managed by UMTH General Services, LP ('UMTH GS' or our 'Advisor'), whereby all operations are conducted by our Advisor or its affiliates."

33.     The Board has approved the concentration of the Company's most powerful offices – Chairman of the Board and CEO – in Greenlaw, at least in part because the Company is purportedly "externally managed by UMTH General Services, LP[.]"According to the 2015 Proxy,

however, Greenlaw is a partner, Vice Chairman and CEO of UMT Holdings, L.P. ("UMTH") and a President, CEO, and a director of UMT Services, Inc. ("UMT Services"). Indeed, according to the Company's 2014 10-K, UMTH GS "engaged UMTH LD as [UDF's] asset manager to oversee the investing and financing activities of the affiliated programs managed and advised by the Advisor and UMTH LD." Again, Greenlaw has also served as CEO of UMTH LD. The general partner of UMTH GS is also the general partner of UMTH LD.

### The Board's Structure and Duties

34.     The Board has four committees: audit; compensation; nominating and governance; and a special committee. According to the Company's 2015 Proxy, the Board claimed responsibility for UDF's shareholders' and other stakeholders' interest in the long-term health and the overall success of the Company and its financial strength.  The Board claimed to be "actively involved in overseeing risk management for the [Company]" by exercising its "approval of all investments and all assumptions of debt, as well as its oversight of the [Company's] executive officers and oversight of [UDF's] corporate governance policies through the proceedings of our independent audit, compensation and nominating and corporate governance committees." According to the 2015 Proxy, the Board discussed material violations of UDF's policies which are "brought to its attention on an ad hoc basis, and once per year reviews a summary of the finance-related violations."  Material violations of UDF's Code of Business Conduct and Ethics and related corporate policies were reported to the Board.

35.     The audit committee is composed of Defendants Marshall, Finkle, and Malone (the "Audit Committee"). According to the 2015 Proxy, the Audit Committee is charged with the selects the Company's "independent registered public accounting firm, reviews with the independent registered public accounting firm the plans and results for the audit engagement,

approves the audit and non-audit services provided by the independent registered public accounting firm, reviews the independence of the independent registered public accounting firm, considers the range of audit and non-audit fees and reviews the adequacy of internal controls." The audit committee reportedly reviewed risks related to financial reporting. The audit committee also reportedly met with UDF's CEO, our !!Advisor, and representatives of our independent registered public accounting firm on a quarterly basis to discuss and assess the risks related to our internal controls.  The board of trustees

36.     The compensation committee is composed of Defendants Finkle and Marshall (the "Compensation Committee"). The Compensation Committee acts under its charter, which was adopted April 22, 2014.  The Compensation Committee, among other things, is responsible for reviewing the Company's advisory agreement with UMTH GS. Pursuant to its charter, the Compensation Committee must "evaluate annually the performance of the Advisor in light of the goals and objectives of the Company and the terms of the Advisory Agreement, taking into account such factors as the Compensation Committee shall consider relevant, and report to the Board the Compensation Committee's views regarding the performance by the Advisor."[2]

37.     Like the Audit Committee, the nominating and governance committee is composed of Defendants Malone, Finkle, and Marshall (the "Nominating and Governance Committee"). The Nominating and Governance Committee acts under its charter, which was adopted April 22, 2014. Pursuant to its charter, the Nominating and Governance Committee is "responsible for overseeing the evaluation of the Board as a whole and management and shall evaluate and report to the Board

---

[2] Available at: http://www.udfonline.com/compensation-committee-charter/ (accessed on February 29, 2016).

on the performance and effectiveness of the Board."[3] To that end, the Nominating and Governance Committee is required to "establish procedures to allow it *to exercise this oversight function*." (Emphasis added.) Further, in reviewing candidates for the Board, the Nominating and Governance Committee is required to consider, among other things, conflicts of interest. Such nominations, however, are only to be made "[a]fter consultation with the Chairman and Chief Executive Officer[.]" Likewise, the Nominating and Governance Committee "review[s] the suitability for continued service as a trustee of each Board member when his or her term expires and when he or she has a change in status, including but not limited to an employment change, and to recommend whether or not the trustee should be re-nominated." Accordingly, the Nominating and Governance Committee has a continuing duty to monitor the conflicts of interest of each member of the Board and to take such conflicts of interest into account when deciding whether to recommend that individual for re-nomination to the Board.

### *Related Party Transactions*

38.     As referred to above, the Company is involved in a number of related-party transactions. According to the 2014 10-K, "[f]or the years ended December 31, 2014, 2013 and 2012, approximately $10.1 million, $8.2 million and $4.2 million, respectively" was paid to UMTH GS, the Company's Advisor. Likewise, as of December 31, 2014, the Company accounted for approximately $1.2 million as accrued liabilities owing to UMTH GS as management fees. Again, UMTH GS is controlled by Greenlaw.

39.     The following table represents debt financing fees paid to UMTH GS by the Company:

| Facility | 2014 | 2013 | 2012 |
|---|---|---|---|
| Credit Facility | $      - | $   13,000 | $   20,000 |

---

[3] Available at: http://www.udfonline.com/nominating-governance-committee/ (accessed on February 29, 2016).

| | | | |
|---|---|---|---|
| Waterfall 4 Loan | 87,000 | - | - |
| Waterfall 3 Loan | 19,000 | - | - |
| UDF IV HF CTB Revolver | 150,000 | 52,000 | 27,000 |
| CTB Revolver | 45,000 | 111,000 | 45,000 |
| UTB Revolver | - | 8,000 | 13,000 |
| Prosperity Revolver | 61,000 | 33,000 | 60,000 |
| Legacy Revolver | - | 4,000 | 50,000 |
| Veritex Revolver | 39,000 | 21,000 | 6,000 |
| Affiliated Bank Revolver | 35,000 | 11,000 | - |
| UDF IV Fin VII Legacy Revolver | 60,000 | 21,000 | - |
| UDF IV Fin VI CTB Revolver | 141,000 | 52,000 | - |
| Independent Bank Revolver | 78,000 | 6,000 | - |
| Capital Bank Revolver | 1,000 | - | - |
| Total | $ 716,000 | $ 332,000 | $ 221,000 |

40.     In addition, the Company has incurred acquisition and origination fees payable to UMTH LD, an entity affiliated with Greenlaw. Specifically, "[f]or the years ended December 31, 2014, 2013 and 2012, approximately $(2.2) million, $9.5 million and $5.2 million, respectively" was incurred by UDF and payable to UMTH LD.

41.     The following table summarizes the approximate amounts paid by UDF to related parties during the fiscal years ended December 31, 2014 and 2013:

| Payee | Purpose | 2014 | | 2013 | |
|---|---|---|---|---|---|
| UMTH GS | | | | | |
| | O&O Reimbursement | $        - | - | $ 8,167,000 | 33% |
| | Management Fees | 9,751,000 | 87% | 7,819,000 | 32% |
| | Debt Financing Fees | 754,000 | 7% | 361,000 | 1% |
| | Advisor Expense Reimbursement | 12,000 | * | - | - |
| UMTH LD | | | | | |
| | Acquisition and Origination Fees | 259,000 | 2% | 7,953,000 | 33% |
| UDF III | | | | | |
| | Credit Enhancement Fees | 416,000 | 4% | 132,000 | 1% |
| Total Payments | | $11,192,000 | 100% | $24,432,000 | 100% |

* Less than 1%

42.     Similarly, the following table summarizes the approximate expenses associated with related parties for the fiscal years ended December 31, 2014, 2013, and 2012:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| Purpose | 2014 | | 2013 | | 2012 | |
| Management Fees | $10,077,000 | 100% | $8,162,000 | 100% | $4,187,000 | 100% |

13

| Total management fees – related party | $10,077,000 | 100% | $8,162,000 | 100% | $4,187,000 | 100% |
|---|---|---|---|---|---|---|
| Amortization of Debt Financing Fees | $   716,000 | (76)% | $  332,000 | 3% | $  222,000 | 4% |
| Acquisition and Origination Fees (1) | (2,160,000) | 228% | 9,504,000 | 95% | 5,188,000 | 93% |
| Credit Enhancement Fees | 484,000 | (51)% | 123,000 | 2% | 177,000 | 3% |
| Advisor Expense Reimbursement | 14,000 | (1)% | - | - | - | - |
| Total general and administrative – related parties | $  (946,000) | 100% | $9,959,000 | 100% | $5,587,000 | 100% |

### UDF is Alleged to be a Ponzi Scheme

43.      As a result of the lack of oversight provided by the Board and the inherent conflicts of interest involved in many of the Company's transactions, investors have made allegations of wrongdoing on the part of the Company and the Board. Among them, Hayman has produced several presentations and created a website dedicated to exposing UDF as a fraud. Indeed, according to Hayman, UDF operates in a manner that appears very similar to that of a Ponzi scheme, whereby UDF supposedly loans and receives money to or from the Related Entities. Then, with that money, UDF is able to repay money it borrowed in previous years. All the while, the loans themselves generate minimal, if any, cash income for the Company.

44.      For example, UMT's business has consistently declined since 2005, with cash from operations dropping from more than $14 million in 2005 to a loss of more than $2 million in 2014. Nonetheless, UMT has paid consistent dividends of $4.00 per share from 2009 through 2014. During this time, UMT has been able to maintain liquidity by borrowing from UDF and UDF III.[4]

---

[4] *See* Hayman research presentation entitled "UDF Management Lacks Credibility: How UDF Management Has Not Recognized Realized Losses in a Public Affiliate," February 2016, available at: https://udfexposed.com/assets/content/News_Research_-_Case_Study_Deficiency_Notes_2_16_16_%28FINAL%29.pdf (accessed on March 1, 2016).

45.     Hayman explained how the Company's management and the Related Entities obscure information on the balance sheets of the various UDF entities. UMT lends money to both related and unrelated parties, which is used to make loans. If UMT or the borrower forecloses on the underlying collateral for less than the outstanding balance on the loan, the borrower has the option to either repay the full amount of the loan or deliver to UMT "an unsecured deficiency note in the amount of the deficiency." In similar situations, UMT will issue a "recourse obligation" on the shortfall.

46.     One entity that owes such recourse obligations is Ready America Funding Corp. ("RAFC"), a company 50% owned by South Central Mortgage, Inc. ("SCMI"). SCMI, in turn, is owned by Todd Etter, a partner in UMTH. According to its quarterly report on Form 10-Q filed by UMT with the SEC on November 13, 2015, UMT foreclosed on the real estate securing an RAFC loan, the estimated value of which was $5,135,000, on September 14, 2015. This left a deficiency of $10,695,254 that was guaranteed by RAFC. This deficiency was merely added to UMT's "RAFC Recourse Obligation balance. The unpaid principal balance of the loan at December 31, 2014 was approximately $15,830,000."

47.     As further evidence of mismanagement and failure of oversight by the Board, Hayman has also pointed to the fact that UDF's loan portfolio is dangerously concentrated in just two borrowers. According to Hayman, 88% of UDF's loans are made either to Centurion American, Thomas Buffington, or the Related Entities.[5] According to the Company's public filings, Centurion American and Buffington have been unable to repay the loans in a timely

---

[5] *See* Hayman research presentation entitled "A Rolling Loan Gathers No Loss: Irregular Patterns Related to UDF's Largest Borrower," January 2016, available at: https://udfexposed.com/assets/content/UDF_Loan_Patterns_1_28_16.pdf (accessed on March 1, 2016).

manner. Furthermore, a number of UDF's loans to Centurion American contain an unusually high debt service requirements (approximately 13% annual interest rate on average). Nonetheless, UDF has not received any cash income from these loans.

48.     Specifically, Hayman alleges that 67% of UDF's loans are owed by Centurion American and that these loans typically do not generate actual cash income. When the loans are not repaid, the loans are repeatedly extended without an extension fee. For instance, Hayman identified a loan made to CTMGT Alpha Ranch, LLC, a Centurion American/Mehrdad Moayedi entity. As of December 31, 2012, the outstanding balance was approximately $11 million and set to mature on July 31, 2014. The collateral securing the loan was a second lien on 1,122 acres of land. As of September 30, 2015, the outstanding balance had increased to $21.8 million and the maturity date had been extended to October 31, 2015. From 2012 through September 30, 2015, however, the Company had not received a single dollar in cash receipts from the loan. Similar circumstances were noted relating to One Windsor Hills L.P., CTMGT Granbury, LLC, CTMGT Montalcino, LLC, CTMGT Regatta, LLC, CTMGT Regatta II, LLC, CTMGT Williamsburg, LLC, CTMGT Williamsburg 1B FL-2, LLC, CTMGT Frisco 122, LLC, Travis Ranch (TR) Participation, and CTMGT Frontier 80, LLC, other Centurion American/Mehrdad Moayedi entities. In each case, the outstanding balance continually increased over several years without financial benefit to the Company. Indeed, only the loan on Travis Ranch (TR) Participation generated any cash receipts for UDF whatsoever—a total of $719,432 on a loan that had a principal balance of $17.8 million as of September 30, 2015.

49.     The favorable treatment of Centurion American and its CEO Mehrdad Moayedi is not coincidental. According to Hayman, Moayedi has significant ties to UDF and the Related Entities: (1) Greenlaw and Moayedi co-own or recently owned a private jet together; (2) Centurion

16

American and a private UDF affiliate co-own a Dallas high-rise condo building; (3) Centurion American and a private subsidiary of UDF I shared a 50/50 partnership to purchase and sell residential lots near Austin, Texas; and (4) UDF over-lent to Centurion American, which redirected excess funds to UDF I without any apparent reason to do so.[6] Accordingly, Hayman has identified Centurion American/Moayedi as a critical conduit for UDF management to move funds between the UDF entities.

50.     Similar treatment has been extended to Buffington-related borrowers. According to Hayman, Buffington loans account for 10% of UDF's loan assets. Of these loans, six have matured without being extended or repaid.

51.     At bottom, according to the 2014 10-K, UDF paid $51.2 million ($42.3 million in cash) in distributions to shareholders. At the same time, however, only $42.7 million in cash was generated from operations. Accordingly, approximately $9.6 million in distributions had to be funded by borrowing according to the 2014 10-K.

*Further Irregularities Surrounding UDF Suggesting Mismanagement*

52.     On October 30, 2015, a lawsuit was filed against BHM Highpointe, LTD, a UDF borrower and Buffington entity, and the Company alleging fraud, breach of contract, tortious interference, and fraudulent transfer.

53.     On November 19, 2015, Whitley Penn LLP, the Company's auditor, informed UDF "that it has declined to stand for reappointment as the Company's independent registered public accounting firm."[7] Whitley Penn likewise declined to stand for reappointment as the auditor for

---

[6] *See* Hayman research presentation entitled "One Example of Many: UDF's High Flying Conflicts of Interest," January 2016, available at
https://udfexposed.com/assets/content/A_High_Flying_UDF_Conflict_of_Interest_1_28_16.pdf
(accessed on March 1, 2016).
[7] *See* Form 8-K filed by the Company with the SEC on November 24, 2015.

the Related Entities. Again, Defendant Marshall served as the audit partner for Whitely Penn in charge of auditing UMT.

54.     On November 24, 2015, William Kahane resigned from the UDF V board of trustees. Kahane is a founding partner at AR Capital. Just a week prior, AR Capital announced that it would stop creating and selling nontraded REITs—the very type of investment vehicle that UDF V is. Kahane founded AR Capital with Nicholas Schorsch, who was also a principal shareholder of RCS Capital and Realty Capital Securities. RCS Capital filed a petition for protection under Chapter 11 of the U.S. Bankruptcy Code in late January 2016.

55.     On December 28, 2015, yet another lawsuit was filed against the Company in Fort Bend County, Texas. This lawsuit alleges a fraudulent scheme involving fake borrowers was orchestrated by UDF's management.

56.     Hayman has also alleged that at least five of UDF's loans are secured by unimproved property. Hayman, which is also based in the Dallas area, has represented that members of its staff have travelled to the parcels securing the loans and personally observed and photographed their undeveloped status. This fact expressly contradicts public statements made by UDF's management in public filings with the SEC.

### The Government Takes Action

57.     The myriad irregularities and suspicious circumstances surrounding UDF and the Related Entities have not gone unnoticed. As finally disclosed by the Company on December 10, 2015, the SEC began investigating UDF in April 2014. It is worth noting that this fact was only disclosed after short sellers began publicizing adverse allegations against the Company and the Related Entities, *i.e.*, that they are run like a Ponzi scheme.

58.     Finally, on February 18, 2016, the Federal Bureau of Investigation raided UDF's offices. FBI agents were seen carrying boxes of material out of the Company's offices. UDF's stock plunged 55% on the NASDAQ after the FBI raid was announced. The FBI, however, did not comment on the investigation.

59.     As a result of the FBI raid, NASDAQ moved to halt the trading of UDF stock. The trading halt status has not been lifted as of the date of this filing.

### Securities Fraud Suits Have Been Filed

60.     Not surprisingly, the financial markets have reacted to the negative information relating to the Company. Specifically, after the December 10, 2015 short seller accusations, UDF stock fell $6.05 per share to close at $11.15 per share, a 35% drop. Following the Company's acknowledgement of the SEC investigation, the Company's stock fell another $2.60 per share, or 23%, to close at $8.55 per share on December 11, 2015.

61.     Following the decline of the trading price of the Company's stock, several federal securities class action law suits were filed against UDF in the United States District Court for the Northern District of Texas.[8] These suits allege that UDF issued false and misleading statements that misled the investing public regarding UDF's provision of liquidity to the Related Entities, that if the flow of retail capital to UDF was halted the earlier Related Entities would fail, that the Company was under SEC investigation, and that the Company's financial statements and future prospects were misleading.

---

[8] *Carter v. United Development Funding IV et al.*, Case No. 3:15cv4030 (Dec. 21, 2015); *The Charles G. and Rose M. Fairbanks Living Trust v. United Development Funding IV et al.*, Case No. 3:15cv4055 (Dec. 23, 2015); and *Anderson et al. v. United Development Funding IV et al.*, Case No. 3:16cv456 (Jan. 7, 2015).

## DEMAND ALLEGATIONS

### *Plaintiff Served a Demand on the Board of Directors*

62.     On February 22, 2016, Plaintiff Richard Evans sent a letter to the Company's Board via Federal Express.   The letter detailed the allegations asserted by Hayman, including the resemblance of the Company's business to a Ponzi scheme, the self-interested transactions by UDF's executives, and other irregular events surrounding the Company.   The letter demanded that the Board, on behalf of the Company, establish an independent committee of investigators to assess the truth of Hayman's allegations; take corrective actions against any individuals responsible for such wrongdoing and mismanagement; and adopt and implement adequate internal controls and systems that would serve to prevent the a recurrence of the wrongdoing described herein.

63.     As the Board has not responded in any way to Plaintiff's demand, it is obvious that the Board has refused to comply therewith. The Board has had sufficient time to respond to Plaintiff's demand, yet has failed to do so, which is not, and could not be in good faith. Accordingly there is no impediment to Plaintiff commencing and prosecuting this action on behalf of the Company.

## DERIVATIVE ALLEGATIONS

64.     Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

65.     Plaintiff brings Counts I, II, and III, derivatively on behalf of and for the benefit of UDF, to redress injuries suffered, and to be suffered, by it as a direct and proximate result of the breaches of fiduciary duties alleged herein.

20

66.     Plaintiff purchased shares of UDF beginning on December 29, 2014, and has held said shares continuously through the present time.  Thus, Plaintiff was a UDF stockholder during the wrongdoing complained of herein.

67.     Plaintiff will fairly and adequately represent the interests of the Company, and has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

68.     Plaintiff bring this action derivatively in the right and for the benefit of UDF to redress injuries suffered and to be suffered by UDF as a result of the defendants' breaches of fiduciary duty, corporate waste, and unjust enrichment.

69.     This is not a collusive action to confer jurisdiction on the Court which it would not otherwise have.

## COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against the Director Defendants)

70.     Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

71.     As directors of the Company, each Director Defendant owed the Company and its shareholders the fiduciary obligations of loyalty and due care.

72.     As demonstrated by the allegations above, the Director Defendants have allowed UDF to engage in related-party transactions, the intention of which was not to benefit UDF, and have failed to maintain proper oversight over the management of the Company's business.

73.     As a result of the Director Defendants' actions, the Company has been and will be damaged.

74.     Plaintiff and the Company have no adequate remedy at law.

**COUNT II**
**Unjust Enrichment**
**(Derivatively Against Defendants Greenlaw, Etter, UMTH GS, and UMTH LD)**

75.     Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

76.     UMTH GS and UMTH LD, as external manager and asset manager, respectively of the Company, have been paid excessive advisor and management fees.

77.     Greenlaw and Etter, as a partners in UMTH GS and UMTH LD, hasve received benefits from the Company in the form of advisor and management fees. These fees were paid by the Company to these entities which are under common control.

78.     It would be unconscionable and against fundamental principles of justice, equity, and good conscience for Greenlaw, Etter, UMTH GS, and UMTH LD to retain the benefits of these advisor and management fees.

79.     Greenlaw, Etter, UMTH GS, and UMTH LD have been unjustly enriched at the expense and to the detriment of the Company.

80.     Plaintiff and the Company have no adequate remedy at law.

**COUNT III**
**Aiding and Abetting**
**(Derivatively Against the UMTH GS and UMTH LD)**

81.     Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

82.     UMTH GS and UMTH LD have aided and abetted the Director Defendants' breaches of fiduciary duties.

83.     As a result, Plaintiff and the Company have been and are being harmed.

84.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding the Company the amount of damages it sustained as a result of Defendants' breaches of fiduciary duties;

B.      Compelling Defendants to disgorge to the Company the benefits they have received as a result of their breaches of fiduciary duties;

C.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 4, 2016

Respectfully submitted,

**DEANS & LYONS, LLP**

_____
Michael P. Lyons
Brian P. Lauten
325 North Saint Paul Street, Suite 1500
Dallas, Texas 75201
Tel: (214) 965-8500
Fax: (214) 965-8505

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt (*pro hac vice to be submitted*)
Adam M. Apton (*pro hac vice to be submitted*)
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121

*Attorneys for Plaintiff Richard Evans*

## VERIFICATION

I, Richard Evans, hereby verify that I am familiar with the allegations in the foregoing complaint, that I have authorized the filing of the complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 3 , 2016

RICHARD EVANS